Yes, Neil Evans on behalf of Propellant. Can I ask you, just hang on, do we have the other lawyer? They just don't show up. I see his name on the screen. I don't think he, he may have stepped away. I don't know. I just want to make sure everyone's here. Okay. As long as our other counsel is on board, then you're welcome to proceed. Thank you. Good afternoon, Your Honors, and I appreciate this opportunity to address you. This case is somewhat unique, and certainly the facts are like something out of a movie, that you have a plaintiff, or it should be an independent, Gerard Thiefer, who's also an insurance agent, licensed insurance agent, and he secures an insurance policy online with a company, the Plaintiff AMCO, that has approved him, appointed him, as an agent for that company, which under Insurance Code 1704 is a mandatory requirement for someone to act as an agent for an insurance company. They have to be appointed. The evidence also establishes that he... Excuse me, counsel, I thought the law was pretty clear that, in the state law, that he was an agent for the insurance company insofar as he could bind coverage, but he was an agent for the person seeking coverage to the extent of choosing the insurance company and the amounts.  I'm not familiar with the concept that he is not an agent for the insurance company when he's selecting the amounts. I mean, this is the problem. You know, the statement is from Mercury Insurance, and it was quoted by the district court, and it's ignored in your opening brief. If an insurance agent is the agent for several companies, and either selects the company with which to place the insurance or picks an insurer at the insurance direction, the insurance agent is the agent of the insured, not the insurer. That was the grounds on which this case was dismissed by the district court, citing this very language from Mercury Insurance, and Mercury Insurance is not discussed in your brief, and then you say you're not familiar with this rule. Well, I would distinguish that case, and perhaps I should have filed a reply to do so, but that case did not involve an appointed agent. It involved a generic independent broker who had the choice, as all brokers do, to pick what insurance company to want to place. I think that case is limited to its facts in the context of here you have an appointed agent who has the authority to buy. I don't believe under that case, the Mercury case, we're dealing with an agent that has been appointed, that has authority to bind. It stands for the proposition that, generally speaking, if someone can pick any insurance company they want, and they pick an insurance company, that doesn't make them an agent. But in this case, we had an individual who was appointed agent, who actually had a contract to bind the specific policy that's at issue in this case. He had authority to bind a 250, 500 policy specifically in the contract. He had authority to bind the policy. So I think the bigger point, I think, that's not really argued in anybody's papers is, since he had that authority, and this, I think, one of the issues in the case actually was he had to scroll down the limits on the application on his computer. And so there's 2550, it's not 25,000, 50,000, it's 2550. I think it's probably 100, 300, or 50, 100. And then there's the option for 250, 500. So he's scrolling down on his computer and clicking on the one that he wants. He had authority to bind 250, 500. And there's no indication, and I see where counsel in his brief makes reference to, that it's temporary binding authority. But that's not really what it is. It's binding authority specifically authorized by an appointment that's published publicly in a contract that specifically authorizes him to bind 250, 500. And, of course, the insurance company has the right to reject a policy for good cause or for some reason that comes up. But there's no information whatsoever in this case that that would have happened. So basically what we're dealing with is a situation where he had authority to bind 250, 500, no question about it. No one is saying he didn't have that authority. He fills out on the screen on his computer on December 15, 2017, he fills out the application clearly intending to be 250, 500 because the contemporaneous policy and all of its policies were approved. The adverb is what's giving me a hard time. He said clearly. It looks to me from the record as though the only thing that suggests that he tried for the 250, 500 is his declaration. And it looks as though, but it's hard to know exactly what the significance of what I'm looking at is. It looks as though the insurance company says he checked the box for 2550. Now, based on my experience doing insurance litigation, back in the 70s and 80s, nobody in his right mind would check the box for 2550 unless he was going to be barred from a higher limit. But this way he did. The insurance company shows us something purporting to prove that he checked the 2550 box. They had numerous mailings to him which he says he didn't receive, which would show that he only had 2550. And to me the question is, does his declaration to the contrary set up a genuine issue of material fact so that a jury should just decide, did he check 2550 or 250, 500? Well, it would have been less favorable for us and more favorable for the client if it was a box. I believe the testimony that was presented, I think in his declaration, he makes reference to it. It's a scroll down menu. It's like a wheel on the computer. And so you have to click, you use your mouse and click down and scroll down. Usually the way those work is you just click on the box for what you want, like small, medium, large. You click on medium, right? That wasn't the case here, and that's part of the facts that I think some fact finders should evaluate. It wasn't a box. It wasn't like there was a distinct box for 2550. It was a scroll down menu. Do we have a picture of what he did on his computer, what he would have seen and what he checked? I don't know that it's in evidence that it was attached to the declaration by the plaintiff, their underwriting person who submitted the declaration, but I believe it's pretty clearly described as a scroll down menu. You have to click the arrow to go down to whatever you're looking for. And I know because as I get older my vision is not so clear that sometimes you have to be really careful when you're using those click down menus to make sure that you're getting the right one. In this case, 2550, 250, 500, I mean there is the possibility that a mistake was made, but he's saying, no, I didn't make that mistake. I scrolled down to 250, 500. If this was a situation where there was a distinct box, you know, on a different part of the form, then I would say it's a different set. But I think here you've got somebody who's saying, and he's genuine in saying that, and he's convincing because he's always taken the 250, 500 limits. The plaintiff submitted evidence of that. We submitted evidence of that, that every policy, including a correctorial policy with Metropolitan, was true. You've got lots of circumstantial evidence that he meant to get 250, 500. Whether he, in forming his contract with the insurance company, did what was necessary on the scroll down menu to say that he wanted 250, 500 is the question. That's a question of fact. If this was an appeal of the decision after the trial and credibility was waived and cross-examination occurred and all that, it would be a different discussion. But we're talking about the summary judgment where I think, humbly, that there were factual issues, both as to the agency issue, I don't think necessarily that was a question of law, as well as credibility on both the issue of whether he, in fact, did it properly scroll down. I just want to make sure I understand what the facts are that are pleaded. As I understand the history of the policy, there were like seven or eight changes over the course of it, and the company says that it sent out notices to their address and they have the correct address, and his affidavit is that he received none of them. Not the original policy, none of the other notices. He never got anything. Is that right? Do I have that right? Correct. That's right. And then he says he never had reason to double-check the limits because he just didn't question what he had done. Since he was the author of the policy, since he was the one that did the scroll down, and since this is what he does for a living independently of being an insured, he didn't question himself, which is not uncommon in the real world. People don't question what they do themselves. You're not alleging they had the wrong address, so he doesn't claim they had the wrong address. There is no allegation they had the wrong address. The facts are that both him and his wife said they did not receive any mailings that had this information. And the changes he testified, and I believe it was addressed by both sides, he testified that when he made changes, he didn't have to access the limits and didn't access the limits. So it's a situation where someone is saying under penalty of perjury, I know exactly what I did, this is what I do for a living, here's every policy in the last 10 years, I've done it exactly the same, I requested 250, 500, it wasn't my mistake that led to it, I can't explain why it didn't happen. Yes, I never checked, even though I had access to it, I never checked the limits. And both my wife and I claim we never saw any mailing that alerted us to this issue. So it's a bad set of facts and something out of, as I said, a movie or a bad movie, that the insured himself is the broker, he's the one that was charged with the responsibility of requesting the policy, he's the one that used the scroll down menu, and believe it or not, had a modest accident happen, not this horrific one that happened that you heard a little bit about, the insurance company wouldn't have said anything about it, but because they knew this was a potentially excess policy limits accident, they're taking a strong position. But a less severe accident that didn't involve potential full policy limits, I don't think the carrier would be raising it. Now this is a guy that has been writing policies for AMCO for many years, never had a problem like this before. Do you have any document, I'm looking at 2ER, page 233, I'm wondering if that's what he would have seen on his computer screen, and if this box around 2550 and the fill in next to it that says 25, if that's a reproduction of the screen that he would have seen and where he would have checked that off, just like the clothing size hypothetical I gave you a few minutes ago, or if it's something different from that. He described it in his declaration and in his deposition as a scroll down menu. It is a scroll down menu. Could you look at it, you undoubtedly have a sticky on it right in front of you. Unfortunately, I do not have that in front of me. I apologize, I don't have that in front of me. I mean, thinking about 2550 on the one hand, it looks like the insurance company has evidence that that's what he asked for and that's what he got and he was communicated with and saw it and would have seen it and didn't change it. On the other hand, a 2550 policy means any personal injury case at all is a potential policy limits case. Excess risks for everybody involved. And this is an insurance agent. This is an insurance agent who would never have knowingly and willingly only selected 2550 for himself. No question that it's unlikely in the extreme that he intended to buy 2550. The question is whether he did. Right. And that is a question of fact for the prior fact. In addition, I think that there are factual issues relative to this issue about his agency relationship. I think that we can distinguish the Mercury case, and I think the bottom line is that this case should have been decided at trial and not on summary judgment. I think that the gut reaction of the judge was, how is it possible that he didn't look and verify the coverages? How is it possible? He didn't get his mail. I don't believe this guy. And the unruling against him, it was sort of a gut reaction. I don't think it was a fair gut reaction in this context. Thank you. Thank you. Hopefully we have the other lawyer on who will magically appear. Go ahead. All right. We got you. Go ahead. Good afternoon, Your Honors. I'm here to teach the court. My name is David Borowski. I represent the Appellee Amco Insurance Company. Counsel, could you help me with the same question I had? Is there something in the excerpts that is a reproduction of the form as Kiefer would have seen it and scrolled and checked? Yeah, I don't believe that's in the record, Your Honor. And I don't think it's 2233 either. I think that's the page that you referenced earlier. Your Honor, I think that is a copy of one of the declaration pages that went to the insurance. It was mailed and available to them electronically. No, there was no limit. Okay. Let me ask the question that follows that. Why isn't there a genuine issue of fact about whether Kiefer, as his name, checked the 2550 box or the 250-500 box in view of 4ER-718, that's Kiefer's declaration, where he says that there's absolutely no question in my mind that I deliberately, purposefully, and actually selected the option of 250-500 and 2550. The scroll down menu for limits did not reflect the entire numerical amount of the damage. It did not state 250,000, 500,000, but only 250,500. You've got a lot of persuasive circumstantial evidence that appears to have persuaded the district court and is really persuasive that he checked the 2550 box. It might have been a mistake. He might have meant to check the 250-500 box, but it's not what he did. He asked for 2550. He got 2550, and that's all he bought. But why isn't his statement in his declaration that he checked the 250-500 box enough so that he gets a jury trial? Well, it's a good question. And the reason, Your Honor, is that there's undisputed facts and testimony about the capacity that he was acting when he checked that box. He was acting, even though he was an appointed agent. He was an appointed agent for multiple insurance companies. Let's assume that under that Mercury case that he's acting for himself, and let's say there's good evidence that he's just mistaken in his declaration. You can be sure of something. You can be sure you closed the garage door, and then you get back home and you left it open. He could be mistaken. He could be lying. He certainly has an interest. But nevertheless, if somebody swears the most material fact in this case is whether he checked 2550 or 250-500, it's material and it's a fact, and it appears that his declaration puts it in dispute. I just don't understand why that isn't a genuine issue of material fact precluding summary judgment. Because there's no evidence that AMCO, the insurance company, ever agreed to provide insurance in excess of that amount, of the 25,000. No, no, that's not enough to preclude summary judgment. There's no evidence that AMCO would have said no. Well, that's correct, but there's no evidence of an agreement to that higher limit. And Mr. Keefer acting for himself, if he made a mistake. I think you're responding to an argument that I'm not asking you about. Okay. What I'm asking you about is, since you put in no evidence, and there's no reason to infer from the record anything like this, that AMCO would have said no if he'd asked for 250-500. As far as we can tell, it's like, do you want this pair of pants or that pair of pants? He'd say, I want that pair of pants. And there's no reason to think that the clothing store won't sell you that pair of pants. Same with the 250-500 policy. No reason to imagine that AMCO wouldn't sell it to him. The question is, did he say, I want that pair of pants, the 250-500? He certainly didn't. Why isn't his declaration enough to set up a genuine issue of fact about whether he checked the 250-500 box? Well, I guess the answer is that there may be a genuine issue of fact as to that question, but the question is irrelevant, because what Mr. Keefer intends to do, acting as the insurance agent, is not sufficient to create a contract between his clients and the insurance company. He can bind the insurance company, can't he? No, all they can do is he can bind temporarily while they consider an application and decide whether to accept it or reject it. So in this situation, had he made a request for an insurance policy, if clients had walked into his office and said, I need insurance starting today, he could have said, okay, I have an appointment with AMCO. I can send them an application today, and I'll get you a policy. And as long as they accept it, it will be binding today. But the binding nature of that contract is only going to be based on what AMCO receives. If Mr. Keefer then makes an error in transmitting the application and gets them less than what they asked for, that's on him. He's acting as the agent of the insurer, and if he makes an error, that error is not imputed to the insurance company. You've got two different lines of thought in that answer. One is, if he makes an error and checks 2550, that's all he gets. And the other is, even if he did check 25500, it doesn't matter because he didn't get 25500. Well, if he had checked 25500, that's what he would have got. I mean, in other words, the insurance company can only issue a policy based on the information it receives. So he would have gotten 25500 if he checked the 25500 line. Correct. But, again, that temporary binding authority is just for the period of time that the company is considering the application, he can bind them. And so long as the company agrees to provide the insurance that's been asked of them with the limits that's been asked of them, then, yes, the coverage can be bound back to that date that Mr. Keefer is sitting in his office with a client and submits the application. If the company rejects it, there was never a policy in the first place. I understand that. Go ahead, Judge Keefer. I'm thinking this is where you get into reformation. I'm thinking in terms of the pants hypo. If you show the customer the chinos and the black pants, and he says they want the black pants, and the clerk accidentally puts the tan chinos in the bag, the customer comes back and says, no, I want the black pants. And the store gives it to him because it knows they made a deal for the black pants. That's his deal. If they give him the chinos and he doesn't notice until a couple months later when he's going on a trip he needed the black pants for, he's still entitled to the black pants. And I agree completely. The difference here is there was never an agreement for the 250. And that's the difference between your scenario and this one. That is the difference. But you're saying if he checked the $250,500 box, he would have gotten $250,500. That's what AMCO would have received. And I don't know the internal workings and their underwriting guidelines, but I can't think of a reason why they would have rejected it. It doesn't mean they wouldn't have, but that's just not their fashion. Yeah, most insurance companies say $25,000, $50,000, because everything's at risk of excess and punitive damages. Right. But my focus here is what was the agreement? What was AMCO asked to do? They were never asked at any time prior to this accident to give this gentleman insurance, any amount of $250,500. Can I ask you? Laurie, I'll back off. No, I just want to follow up on your question, Judge Kleinfeld. I understand, Judge Kleinfeld, to be asking you, because we have this declaration from the other side, from Mr. Kiefer, that says, I did check the box for $250,500. The error, Dan, if there was one, was on your client's end, right? So if we start with the assumption that he actually checked the correct box that corresponded to what he wanted, then what? And all I keep hearing you say is that, well, no, he must have checked the $25,000, $50,000, because that's what we processed. But what if the error was on your client's end? That's what I thought Judge Kleinfeld was trying to say, that maybe there's a material factual dispute, because he's saying he checked the correct box for what he wanted, and then you all, perhaps, are the ones who messed up, not the other way around, right? Well, yeah, I mean, I think regardless, the error, the failure to ask for or get what Mr. Kiefer wanted was made in his capacity as an agent for. But you're resisting, again, you said he did not make an error in what he asked for. That's the factual, that's the set of facts you're being asked to assume, right? He did ask for the correct thing. He asked for the black pants or whatever, but it wasn't the IPO, right? And so, whatever happened on your client's end, there was a mistake, because obviously there's no dispute that what ended up getting issued was a $25,000, $50,000, right? Right. But what was asked for was something different. And so, you keep reverting back to, well, but he only asked for $25,000, $50,000, and so everything follows from that. But what if the reverse factual scenario has to be accepted as true? Then what? I understand. I apologize. I misunderstood the question. One of the partners in this contract, AMCO, can only evaluate what they're asked to write by what they receive, right? And so, we have a mountain of evidence showing that AMCO never received any requests for higher limits. So, you can't form a contract with an insured unless they ask for something that the insurance company agrees to. And here, we have no evidence that AMCO has ever asked. Suppose that we had, in addition to everything else in the case, we had a printout that somebody found in a desk from back when the policy was first issued, I think in 2017. And the printout is a screenshot, and it shows that the box for $250,500 was checked. Inexplicably, the wrong thing got issued by your company. But there it is. It says $250,500. What is your view about what would happen in that case? Well, I guess it would have to depend on whether that was a screen that could have been accessed by the insurance company. I mean, I think if there was evidence that that request had actually been received by AMCO, the issuing carrier, then that might be evidence of an agreement to a higher policy. But I think absence of an agreement to a higher limit, you can't change the terms of the policy. As you're following up on that, suppose that he did, in fact, check $250,500, and that's what was received by the insurance company, but they make an internal mistake and issue the subsequent policy. Would he, in his capacity as an agent of the insurer, have been able to temporarily bind them, even though under Mercury he's acting for the insured? So, the temporary binding concept is basically this. He can tell the insurer, you will have coverage so long as this application is accepted by the carrier. And that authority applies even if he's acting as an agent of the insured under Mercury? I believe, well, I think Mercury says that in the capacity of selecting amongst various insurers and picking one and submitting an application, he's acting as the insurance agent. But can he, in doing that, and being an agent of the insured under Mercury, can he then temporarily bind the insurer? What's the answer to that? Pending acceptance of the policy. I believe that's correct. That he could? Yeah, that's the dual agency concept. He has dual powers. But when he's acting in the capacity, and I think he was doing that here, he's acting solely in the capacity as agent for the insured. So, what if the insurance company would accept $250,000, $500,000? I mean, that's not the kind of limits that require some sort of executive attention. It's more like the black pants and the tan pants. It's just pretty much. Right. And, Geo, I think it is important. You said they would have sold it to him. Well, I mean, I suppose that's an open question. I don't have anything to answer. But I will say that the vehicle that he was applying for insurance for here doesn't appear to be one that he was intending to drive. It was a 2002 Toyota Camry that he purchased from his mother-in-law. Okay. And that's. Right. And, moreover, just keep it in the garage. And that's why he didn't meet a high limit. No, no, no. We're not talking the property damage or collision coverage. We're talking liability. And if it's your kid that's driving the car, you want as much liability coverage as you can get. Well, and you think you need to verify it as well, especially if you're an insurance broker. I mean, all of us probably thought our kids had a crime and were on pins and needles, whatever they did for the first year or two. And we're talking liability coverage. We're not talking where a $500 car means you don't want much insurance. You want more. Right. But I think the inference that I took from it was that this was not a car he planned on using very much, if at all. And it was purchased from his mother-in-law for $500. And, you know, the idea that. Where's the kid? Well, I mean, this is the testimony. I didn't tear your kid's car away from him on Saturday night. Right, right. Yeah, and I don't believe that Mr. Kiefer testified that this car was for his son. And I believe that is part of the record. But, you know, I think the point is this, that an insurance broker like Mr. Kiefer, had he really wanted $250, $500 on this policy, over the year that passed and all the changes he made, he never bothered to check, which just doesn't, to me, does not ring true. It seems to me that if it was important to him to have these limits, and especially if it's a car he's going to give his kid, or if he expects there's going to be liability associated with this car, he would have at least checked. And he had ample opportunity to do so. He never did so. And it's just a jury argument. You're a jury. Your position in front of a jury, I think, is quite strong. But the question is whether he's entitled to get a jury. Yeah, and I think because here, I believe the uncontroverted evidence brings this case right along with Mercury, with Pearson, that given the capacity he was acting, any mistakes he made can't be imputed to the carrier, and the carrier can only be bound to show coverage based on what he received. What is a mistake? Either side can make a mistake. I mean, a carrier has a whole lot of people doing very boring work of inputting data into their computers, and you expect an occasional typo. Right, although there's just no evidence that that happened here. The evidence is clear what the evidence is. There is. There is evidence that it happened, because he says, I checked the box for 250, 500, and here I get back a policy which I now discover is only 2550. That's evidence that can support an inference in either direction, either that he's mistaken about which box he checked, or that the insurance company clerk made an error in inputting the data. Right, and again, well, but I don't think there is, the evidence shows that there was no person manually inputting any data. The information was input by Mr. Kiefer into a computer transmitted to AMCO, where it was populated into a field. So no person had to take down the information and put it into the policy. It was electronically transmitted. I thought you said that there wasn't any picture of what he inputted into his computer. I think I said that that may not be in the record, and I would have to double check that. But there was, he did testify about the way it worked, but essentially he selects a drop-down box. The data that he selects is transmitted electronically to the company in an application, and then it's just populated into the policy forms that the company issues. So there's no intermediate step of a person picking it up, looking at it, and saying, okay, they want $250, $500, or they want $25, $50, and making a mistake. There is no, and the evidence is in the record, there was no step like that. So that just supports the conclusion that the mistake, if any, was by Mr. Kiefer, and he's acting as his own agent. It is not an error. It is an error. It can be attributed to the insurance company. That's very significant, what you just said. I'm just wondering how it squares with Rule 56. I mean, what you just said would make a liar, Mr. Kiefer. But why didn't his statement under Hoove still give him an entitlement to it? Well, I think if he had the ability to bind AMCO based on his belief in his mind, then that would be a material statement. But the facts here show that it didn't. He wasn't acting in a capacity where he could bind the insurance company. So that's why his subjective understanding and what he believed is just not relevant here. Even though there may be a question of fact as to what he intended, it's just not a material fact. That's my view. I know I'm confused because what you just said is contrary to what you said in response to and answered to me before. You just said that he wasn't acting in a capacity where he could bind the insurance company. I thought you said that he was acting in a capacity where he could temporarily bind them. Yes, but only to an application that's approved by the insurance company. And I understand it's a complicated, it's a somewhat confusing concept. He did not have the ability to issue a policy by himself. He testified to that. He didn't have the ability to create a policy with limits without approval from the insurance company. So this temporary binding authority just means that from the period of time when he submits an application to when the company approves it and issues a policy, he can advise and ensure that they will have coverage for that interim period so long as the company approves the application. That's the temporary binding authority. It doesn't mean that he can issue a policy on his own, and he testified to that, and that information is in the record. I hope that clarifies. Thank you. Yes, that does. All right, let's hear. I don't know if I have 50 seconds or a minute. You've got a minute. Go ahead. Okay, thank you. My point is that counsel uses this term temporary binding authority, but there's nothing in the record that calls it temporary binding authority. My client, Derren Cheever, had binding authority. He could have bound any limit that's within that authority, and it's specifically stated. Wait, wait, counsel, we have the agency agreement, I thought, in the record. Right. Right? I'm looking at it right here, and it says exactly. The word temporarily is used right in it. So why do you say there's nothing in the record? All right, I may have misspoke, but he has binding authority, and I think that. . . Wait, wait, wait. Let me just read it to you, since we don't have any of the record in front of you for some reason. He's got the authority under this agreement to bind the company temporarily to permit transmission of applications for insurance and endorsements to company for approval and processing or disapproval. It's exactly what your opponent described, and it's totally inconsistent with what you just tried to tell us. So I don't get where you're coming from on that. All right, I'm not trying to misrepresent the record, and I apologize. I think the point is that, different from the Mercury case, in this set of facts, he does have authority to bind the 250-500 policy, and that's what his testimony is. But I requested and had the authority to bind the 250-500 policy, and there's nothing in the record that would indicate that he had done so. It says that he did, under penalty of perjury. Well, the thing I just read is something in the record, and it directly refutes what you just said. I just don't understand why you're saying he had the authority to bind the company in the sense of actually issuing a policy that contained 250-500. No, I'm not saying that. I'm saying that, under his declaration, he had the ability to select the coverages for this particular insurer, and he had the authority to, let's all use their term, temporarily bind it. And that's what he said he did. And as a result, that policy that he requested, if it had been properly transmitted, would have been issued.  So it's basically a pissing match, I speak my French, between his belief and his testimony that he requested the 250-500. And AMCO then says, well, because we didn't issue that policy, the disconnect is something happened between his fingers and his scrolling on the computer, and what happened at the end of the insurance company. And as one of you said, I believe, Heifold said, somebody could have made a mistake here at the beginning of his side, and that's the issue, the probable issue of fact. Your response, though, to your opponent's argument, that that is not, in fact, a reasonable inference from the record, because the record shows that there is no human intermediary that could have made a mistake. It's just whatever your client selected, whatever box he checked, was directly populated into an electronic field that then corresponded to what the company issued. Well, that's his statement of what happened. In terms of whether it was populated accurately electronically, that's still an issue in the case. If a human being selects 250-500 and a machine directs it to a 25-50, it may not be the human that made the mistake. And as to how that mistake occurred or why that mistake occurred, we tried to give a little bit of an explanation in my client's declaration that there were problems with other customers and limits, but that would be up to the prior. Why isn't this a case for application of the following rule from Scott v. Harris? When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. You want us to believe that he checked this box and he checked the 250-500 and it's electronically transmitted, but due to, I guess, some gremlin in the machine, it spits out a 25-50 policy. He gets one notice, a second notice, a third notice, a fourth notice, a fifth notice, a sixth notice, a seventh notice, an eighth notice, a ninth notice, a tenth notice, 11 notices in the record, I mean, in the mail, all to the correct address. I never got any of them. Oh, and by the way, my wife was the one who asked me to get the policy so that, you know, I don't have the issue that I'm getting the policy for myself. All of these things have to be strung together, and oh, and I went in and I made changes to the policy at least six or seven times, and I never once checked the limits. All of these things have to be believed. And you filed this, and I take it you filed this consistent with your obligations under Rule 11 as an officer of the court that this is the true facts. Your Honor, I respect your position in this case and what you're saying, but I have a client who testified in a deposition under cross-examination by Mr. Barofsky exactly to all of those facts, two clients that said that. Scott says there's a limit to how much, how credulous we have to be. Well, I think the difference here is that you have one of the two insureds is the agent who filled out the form, who did the scrolling, and he is adamant about what he did. Also, the inability to recall or recognize the mail and what was stated in the mail. He said they never received it. Whether that was true or not is for a trier of fact to believe. I don't think it's as— Maybe one time, but 11 times? It's the same issue. They never really got a post office, I guess. Not me. It's my clients. And they testified under cross-examination for all those facts, but the declaration was 100% consistent with what he said in his deposition. So the credibility issue is what it is. But at the same time, they don't have anybody that has a hard copy of what he presented. He doesn't have a hard copy of it. So all we have is one witness testifying to what he did, and he's sincere about it. And as to that, he's credible. Okay. Thank you very much. The case just argued is submitted, and the Court is adjourned for this session. Thank you very much. Thank you. Thank you. This Court, for this session, stands adjourned.
judges: KLEINFELD, WATFORD, COLLINS